**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
CAMPAIGN                                )
LEGAL CENTER                            )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )        Civil Action No. 20-0809 (ABJ)
                                        )
FEDERAL ELECTION                        )
COMMISSION,                             )
                                        )
            Defendant.                  )
_____)

<u>**MEMORANDUM OPINION**</u>

On March 24, 2020, plaintiff Campaign Legal Center ("CLC") sued defendant Federal

Election Commission ("FEC") because the agency had failed to respond to an administrative

complaint plaintiff filed on August 23, 2018. *See* Compl. [Dkt. # 1] at 1–2. Plaintiff's complaint

and summons were served on defendant on March 25, 2020. Return of Service [Dkt. # 6].

On May 28, 2020 the Clerk of the Court declared defendant FEC in default for failure to

plead or otherwise defend this action. Entry of Default [Dkt. # 10]. Plaintiff then moved for entry

of default judgment on June 1, 2020. Mot. for Default J. [Dkt. # 11] ("Pl.'s Mot."). On March 11,

2021, the Court denied the motion because the complaint and the first motion for default judgment

"were both filed at a time when the [FEC] did not have a quorum." Order Den. Default J.

[Dkt. # 17] ("Order") at 3. However, the Court stated that its ruling was "without prejudice to a

renewed motion if defendant does not enter an appearance in this case by May 1, 2021." Order at

4.

Plaintiff filed a second motion for default judgment on May 5, 2021.  Renewed Mot. for Default J.  [Dkt. # 18] ("Pl.'s Renewed Mot.").  As in its first motion, plaintiff "requests the Court enter an order declaring that the FEC's failure to act is contrary to law in violation of 52 U.S.C. § 30109(a)(8)(C), and directing the FEC to conform within 30 days."  *Id.* at 4.  To date, the FEC has failed to respond to plaintiff's renewed motion for default judgment or to do so much as enter an appearance in this case.[1]  Therefore, for the following reasons, plaintiff's renewed motion will be **GRANTED**.

## BACKGROUND

Plaintiff brings this claim pursuant to the Federal Election Campaign Act ("FECA"), which establishes a private right of action for "[a]ny party aggrieved" by the FEC's failure to act on a complaint within 120 days of its filing.  *See* 52 U.S.C. § 30109(a)(8)(A); Compl. ¶ 1.  CLC's administrative complaint alleged that an organization called "45Committee, Inc." ("45Committee") "violated [FECA] by failing to register as a political committee and failing to file reports disclosing its contributors, expenditures, and debts."  Compl. at 1.

Plaintiff describes its mission as follows:

> CLC is a nonpartisan, nonprofit 501(c)(3) organization . . . whose mission is to protect and strengthen the U.S. democratic process . . . .  CLC's work on campaign finance-related issues, including public education, litigation, administrative advocacy and enforcement, and legislative reform efforts, depends on accurate reporting of federal election expenditures as required by statute.  This work is obstructed where . . . campaign-finance information subject to mandatory disclosure under FECA is not available.

---

1    While defendant has not responded, the Court has granted leave, Min. Order (May 26, 2020); Min. Order (Aug. 24, 2021), for two amicus briefs to be filed.  *See* Br. Amicus Curiae of the New Civil Liberties Alliance [Dkt. # 8] ("NCLA Br."); Institute for Free Speech Amicus Curiae Br. [Dkt. # 23] ("IFS Br.").  Both briefs ask the Court to deny the motion for default judgment. The Court has read both briefs and considered them in conjunction with the motion.  When referencing the amicus briefs, the Court will cite to the briefs' page numbers as indicated, rather than the page number of their PDFs.

Compl. ¶ 5.  The FEC is an independent federal regulatory agency charged with enforcing federal campaign finance laws, including the provisions of FECA.  *See* 52 U.S.C. § 30106(b).  FECA defines "political committee" to include organizations that receive contributions or make expenditures of more than $1,000 with the purpose of influencing federal elections.  *See* 52 U.S.C. § 30101(4)(A), (8)(A)(i), (9)(A)(i).  FECA mandates that political committees disclose their contributions, expenditures, and debts and obligations to the FEC.  *See generally* 52 U.S.C. §§ 30102–04.

In October of 2015, the *Wall Street Journal* reported that Republican donors had financed the launch of a nonprofit 501(c)(4) organization called "45Committee, Inc."  *See* Compl. ¶ 15, citing Patrick O'Connor & Rebecca Ballhaus, *New GOP Groups Taking Aim at Hillary Clinton*, Wall St. J. (Oct. 27, 2015), https://www.wsj.com/articles/prominent-gop-donors-launch-new-groups-to-take-aim-at-hillary-clinton-1445984161.  45Committee reported spending $21,339,015.32 for media production and placement, surveys, polling, and phone calls between October 4 and November 5 of 2016, all with the stated purpose of either opposing Hillary Clinton or supporting Donald Trump.  *See* Compl. ¶ 20, citing 45Committee Inc., Year-End Report of Independent Expenditures Made and Contributions Received, FEC Form 5, at 3–11 (filed Jan. 31, 2017), http://docquery.fec.gov/pdf/652/201701319042382652/201701319042382652.pdf.

45Committee also reported spending $671,320 for electioneering communications opposing Patrick Murphy, who was running for a U.S. Senate seat in Florida.  Compl. ¶ 20, citing 45 Committee Inc., 24 Hour Notice of Disbursements/Obligations for Electioneering Communications, FEC Form 9 (filed Oct. 28, 2016), https://docquery.fec.gov/pdf/385/201610319037011385/201610319037011385.pdf.  These two categories of expenditures combined ("FEC reported expenditures") total $22,010,335.32.

For the tax year beginning April 1, 2016 and ending March 31, 2016,[2] 45Committee reported to the IRS $46,362,986 in revenue and $45,556,334 in expenses. *See* Compl. ¶ 21, citing 45Committee Inc., Return of Organization Exempt from Income Tax, IRS Form 990, at 1 (filed Feb. 15, 2018), https://www.documentcloud.org/documents/4390683-45Committe-2016-Form990.html. This makes 45Committee's FEC reported expenditures 48.3 percent of the organization's spending for the tax year. Compl. ¶ 22. Subtracting the approximately $4 million in reported spending for the first calendar months of 2017, the FEC reported expenditures constituted nearly 52% of the organization's spending for the 2016 calendar year. Compl. ¶ 22 n.19.

Citing these numbers, CLC filed an administrative complaint on August 23, 2018 with the FEC, alleging that 45Committee's "spending, . . . fundraising appeals, and public statements about its purpose[] demonstrate that [its] major purpose was campaign activity, but nonetheless it did not register as a political committee and did not file mandatory FEC reports disclosing its contributors, expenditures, debts, and obligations." Compl. ¶ 2. CLC further alleged there is reason to believe that, in addition to the FEC reported expenditures, other spending by 45Committee in its 2016 tax year "may have [also] been intended to support the nomination or election of a candidate in the 2016 election." Compl. ¶ 23. CLC points to $37.6 million for "media ads services," which was paid to the same political consulting firms that were paid for the FEC reported expenditures. Compl. ¶ 24. And finally, CLC points to the timing and content of 45Committee's advertisements,

---

2       The Internal Revenue Service ("IRS") allows filers to use calendar years *or* fiscal years for their returns; a fiscal year is "12 consecutive months ending on the last day of any month except December." IRS, *Tax Years*, https://www.irs.gov/businesses/small-businesses-self-employed/tax-years (Sept. 15, 2021).

Compl. ¶ 25, and social media posts, Compl. ¶¶ 26–27, in support of its contention that CLC should have registered as a political committee.

Within a week, the FEC sent CLC a letter acknowledging receipt of the administrative complaint. *See* Compl. ¶ 30.  But the FEC has not taken any action on the administrative complaint since then.  Compl. ¶ 32.  At the time this lawsuit was filed, the administrative complaint had been pending for more than 575 days, Compl. ¶ 32, and plaintiff alleges that the delay is unlawful and merits the Court's intervention; as of today, it has been pending for more than three years.

## LEGAL STANDARD

The Federal Rules of Civil Procedure empower district courts to enter a default judgment against a defendant that fails to defend its case.  *See* Fed. R. Civ. P. 55(a); *Keegel v. Key West & Caribbean Trading Co.*, 627 F.2d 372, 375 n.5 (D.C. Cir. 1980).  While federal policy generally favors resolving disputes on the merits, default judgment is appropriate "when the adversary process has been halted because of an essentially unresponsive party."  *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005) (internal citation and quotation marks omitted).  Default judgment may only be entered against the United States, its officers, or its agencies "if the claimant establishes a claim or right to relief by evidence that satisfies the court."  *See* Fed. R. Civ. P. 55(d).

Obtaining default judgment is a two-step process.  *See* Fed. R. Civ. P. 55(a)–(b).  First, the plaintiff must request that the clerk of court enter default against the party that has failed to plead or otherwise defend.  Fed. R. Civ. P. 55(a).  The Clerk's entry of default establishes the defendant's liability for the well-pleaded allegations of the complaint.  *Int'l Painters & Allied Trades Indus. Pension Fund v. R.W. Amrine Drywall Co.*, 239 F. Supp. 2d 26, 30 (D.D.C. 2002), citing *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 63 (2d Cir. 1971).  Second, the plaintiff must apply to the court for a default judgment.  *See* Fed. R. Civ. P. 55(b).  At the default judgment stage, the

plaintiff "must prove [his] entitlement to the relief requested using detailed affidavits or documentary evidence on which the court may rely." *Ventura v. L.A. Howard Constr. Co.*, 134 F. Supp. 3d 99, 103 (D.D.C. 2015) (internal citations and quotation marks omitted).

"The determination of whether default judgment is appropriate [under Rule 55(b)(2)] is committed to the discretion of the trial court." *Int'l Painters*, 531 F. Supp. 2d at 57, citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980). "[T]he defendant['s] default notwithstanding, the plaintiff is entitled to a default judgment only if the complaint states a claim for relief." *Jackson v. Corr. Corp. of Am.*, 564 F. Supp. 2d 22, 27 (D.D.C. 2008) (internal citations and quotation marks omitted).

## ANALYSIS

### I.      Standing

As the Supreme Court has emphasized:

> Federal courts are courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree.  It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction.

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (internal citations omitted). In addition, "'[i]t is axiomatic that subject matter jurisdiction may not be waived, and that courts may raise the issue *sua sponte*.'"  *NetworkIP, L.L.C. v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008), quoting *Athens Cmty. Hosp., Inc. v. Schweiker*, 686 F.2d 989, 992 (D.C. Cir. 1982).  Indeed, a federal court must raise the issue because it is "forbidden—as a court of limited jurisdiction—from acting beyond [its] authority, and 'no action of the parties can confer subject-matter jurisdiction upon a federal court.'"  *Id.*, quoting *Akinseye v. Dist. of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003).

In order to have a right to relief in a federal district court, a plaintiff must have standing. *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133 (2011) ("To state a case or controversy under Article III, a plaintiff must establish standing."); *accord Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) ("[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III").  Standing is a "necessary predicate to any exercise of [federal] jurisdiction . . . if it is lacking, the dispute is not a proper case or controversy" under Article III, and federal courts have no subject matter jurisdiction to decide the case.  *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1361 (D.C. Cir. 2012) (internal citations and quotation marks omitted).

To establish constitutional standing, plaintiff must demonstrate: (1) that it has suffered a concrete, particularized, and actual or imminent "injury-in-fact"; (2) that the injury is "fairly traceable" to the challenged action of the defendant; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan*, 504 U.S. at 560–61; *see also Friends of the Earth, Inc. v. Laidlaw Env't. Servs.*, 528 U.S. 167 (2000).  According to the D.C. Circuit, an "informational injury," or "inability to obtain information . . . that, on [a complainant's] view of the law" the Federal Election Campaign Act requires a political committee to make public, satisfies these standing requirements for a claim brought under 52 U.S.C. § 30109(a)(8)(A).[3]  *See FEC v. Akins*, 542 U.S. 11, 19–26 (1998); *see also Campaign Legal Ctr. & Democracy 21 v. FEC*, 952 F.3d 352, 356 (D.C. Cir. 2020).

---

[3]    When the *Akins* case was decided, this statutory provision was located at 2 U.S.C. § 437g(a)(8)(A).  It has since been transferred to 52 U.S.C. § 30109(a)(8)(A), which is the provision under which plaintiff seeks relief in this case.

In May of 2021, the D.C. Circuit ruled that plaintiff did not have standing to pursue a similar claim in a separate case. *See Campaign Legal Ctr. v. FEC*, No. 20-5159, 2021 WL 2010494 (D.C. Cir. May 11, 2021) ("*GEO Corrections*"). The Circuit held that (1) a complainant does not have standing to bring a § 30109(a)(8)(A) claim arising from the FEC's failure to act on a complaint without alleging a resulting injury-in-fact; and (2) CLC had forfeited any informational injury claim that may have satisfied the injury-in-fact requirement by not including that claim in its initial complaint. *See GEO Corrections* at *2–4. In light of that decision, this Court asked plaintiff to submit a supplemental brief addressing subject matter jurisdiction over the instant matter. Min. Order (July 9, 2021); *see also* Pl.'s Suppl. Mem. Regarding Subject Matter Jurisdiction [Dkt. # 20] ("Suppl. Mem.").[4]

---

4       The New Civil Liberties Alliance argues in its amicus brief that plaintiff lacks standing, and that this Court otherwise lacks jurisdiction. *See generally* NCLA Br. Insofar as the NCLA claims that this Court lacks jurisdiction because federal courts cannot order an agency "to exercise its prosecutorial discretion," NCLA Br. at 11, the Court notes that notwithstanding that general proposition, mandamus relief of this nature has been considered proper by federal courts for decades. *See, e.g.*, *In re Nat'l Cong. Club*, No. 84-5701, 1984 WL 148396, at *1 (D.C. Cir. Oct. 24, 1984) ("[I]n using the language 'contrary to law' [in FECA], Congress appears to have intended that the unreasonableness of the Commission's delay in completing its task be tested under standards generally applicable to review of agency inaction."). It appears that the organization may simply be confused about what plaintiff is actually seeking. *See, e.g.*, NCLA Br. at 14 ("Entering default means that this Court would have to determine in the first instance whether there is reason to believe a FECA violation factually occurred."). Plaintiff seeks an order directing the agency to act on the complaint, not an order directing the agency to act in a particular way. *See, e.g.*, Pl.'s Renewed Mot. at 5 ("Plaintiff respectfully requests the Court enter an order declaring that the FEC's *failure to act* is contrary to law.") (emphasis added). And insofar as the amicus criticizes plaintiff for not immediately bringing suit, NCLA Br. at 14, that decision would not justify denying the entry of judgment in plaintiff's favor; the law is clear in this circuit that short delays on the part of an agency may not justify mandamus relief. *See, e.g.*, *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 73 (D.C. Cir. 1984) ("*TRAC*") (deciding agency delay was not necessarily unreasonable even though the agency had "taken no further action . . . [in] almost five years").

       In short, the Court has considered NCLA's objections to the entry of default judgment, but they are unpersuasive.

The Court finds that plaintiff does have standing here.  In the *GEO Corrections* case, CLC did not plead that it suffered an informational injury in its initial complaint, and it raised that argument for the first time on appeal.  *See GEO Corrections* at *5–6.  The Circuit found that CLC had thus "forfeited" the informational injury standing argument since "[n]either its federal court complaint nor its administrative complaint contains any allegation that the Center is seeking information, much less that the Center is injured by the lack of such information."  *Id.* at *5.

Here, CLC has described the information it seeks in its complaint, and it specifically alleges the nature of the injury resulting from its withholding:

> 'CLC's work on campaign finance-related issues, including public education, litigation, administrative advocacy and enforcement, and legislative reform efforts, depends on accurate reporting of [f]ederal election expenditures as required by statute,' and '[t]his work is obstructed where, as here, campaign-finance information subject to mandatory disclosure under FECA is not available.'

Suppl. Mem. at 6, quoting Compl. ¶ 5.  This is sufficiently analogous to respondents' claim in *Akins* that information about an organization's donors and campaign-related contributions "would help them (and others to whom they would communicate it) to evaluate candidates for public office, especially candidates who received assistance from [the organization], and to evaluate the role that [the organization]'s financial assistance might play in a specific election."  *Akins*, 542 U.S. at 21.  As a result, the Court is satisfied that CLC has demonstrated its standing to bring this case.

## II.    **Mandamus Relief**

The D.C. Circuit has established that whether the FEC's treatment of a complaint is "contrary to law" within the meaning of 52 U.S.C. § 30109(a)(8) should be determined by applying the factors set forth in *Common Cause v. FEC*, 489 F. Supp. 738, 744 (D.D.C. 1980) and *TRAC*, 750 F.2d 70.  *See FEC v. Rose*, 806 F.2d 1081, 1084 (D.C. Cir. 1986).  The *Common Cause* factors

pertain to whether action was "contrary to law" under § 30109(a)(8)(C) and the *TRAC* factors provide guidance about whether a delay was unreasonable and mandamus relief is justified. *Rose*, 806 F.2d at 1084 n.6.

### A. *Common Cause* Factors

*Common Cause* enumerates 5 factors for determining whether agency delay is "contrary to law" within the meaning of 52 U.S.C. § 30109(a)(8)(C):

> (1) the credibility of the allegations made in the administrative complaint;
>
> (2) the nature of the threat posed by the violations alleged;
>
> (3) the resources available to the Commission for investigating the complaint;
>
> (4) the information available to the Commission; and
>
> (5) the novelty of issues raised by the complaint.

*Rose*, 806 F.2d at 1084 n.6, citing *Common Cause*, 489 F. Supp. at 744.

Four of the five factors are quite straightforward. The first factor is whether the allegations are credible. CLC's administrative complaint asserts that 45Committee should have registered as a "political committee," which is defined by statute to include organizations that receive contributions or make expenditures of more than $1,000 with the purpose of influencing federal elections. 52 U.S.C. § 30101(4)(A), (8)(A)(i), (9)(A)(i). 45Committee has not registered, yet according to the complaint, "[d]uring the 2016 election cycle, 45Committee reported spending $21,339,015 on independent expenditures opposing presidential candidate Hillary Clinton or supporting her opponent, Donald Trump." Compl. ¶ 20. The allegations made in CLC's administrative complaint are based on filings that 45Committee itself made with the FEC and the IRS. *See, e.g.*, Compl. ¶ 21, citing 45Committee Inc., Return of Organization Exempt from Income Tax, IRS Form 990, at 1 (filed Feb. 15, 2018), https://www.documentcloud.org/documents/4390

683-45Committe-2016-Form990.html.  The Court is satisfied that the evidence cited by plaintiff and the conclusions it draws from this evidence give rise to a credible allegation, and the first factor weighs in plaintiff's favor.  And, because this information is publicly available, with some even being publicized by defendant itself,[5] the fourth factor – the information available to the Commission – also weighs in plaintiff's favor.

Further, as CLC points out, its "allegations that 45Committee failed to register as a political committee and failed to report its contributors, expenditures, and debts as required by FECA are not remotely a 'novel' issue."  Pl.'s Mot. at 10–11.  "FECA's registration, reporting and disclosure requirements for political committees date back to the mid-1970s, and the test for whether an entity constitutes a PAC was adopted in *Buckley v. Valeo*, which was decided in 1976."  *Id.* at 10.  Given the routine nature of this administrative complaint, the fifth factor also weighs in plaintiff's favor. The routine nature of the complaint also plays into the second factor, the nature of the threat posted; the nature of the threat posed by the violations alleged is exactly the kind envisioned by the FECA provisions that authorize anyone to file such complaints with the FEC.  "Any person who believes a violation of this Act . . .  has occurred, may file a complaint with the Commission."  52 U.S.C. § 30109(a)(1).  CLC alleges that 45Committee, Inc. has failed to register as a political committee in violation of the Act, and that such failures are harmful to our democracy and system of elections. *See generally* Compl.  This factor weighs in plaintiff's favor, as well.

The third factor – the resources available to the Commission for investigating the complaint – is more complicated, but it still ultimately weighs in plaintiff's favor.  While the lack of a quorum

---

5       The complaint links to documents submitted to the FEC and available on its website.  *See, e.g.*, Compl. ¶ 20, citing 45Committee Inc., Year-End Report of Independent Expenditures Made and Contributions Received, FEC Form 5, at 3–11 (filed Jan. 31, 2017), http://docquery.fec.gov/pdf/652/201701319042382652/201701319042382652.pdf.

temporarily impeded the agency's ability to *decide* whether to initiate an investigation in response to the complaint, there is no indication that the FEC lacks the resources or capacity to conduct investigations or perform its statutory duties under FECA. *See* 52 U.S.C. § 30109(a)(1); *see also* Pl.'s Second Notice Regarding the FEC's Quorum [Dkt. # 16] ("Second Notice") ¶¶ 3–4 ("The FEC has now had a quorum of Commissioners for more than a month, during which time it has held at least three Executive Session meetings where the Commission discusses pending enforcement actions and litigation, among other confidential matters," and "[d]uring at least one of those meetings, the Commission voted to authorize defense of at least one other lawsuit alleging FEC inaction.") (citations omitted).  While the Court acknowledges that the agency may have had a number of matters to attend to after it regained quorum, it has extended the agency considerable courtesy in awaiting its response, and this factor now weighs in favor of plaintiff, as well.

For these reasons, the *Common Cause* factors weigh in favor of plaintiff.

**B**. ***TRAC* Factors**

The Court next turns to the factors that bear on the reasonableness of the delay.  Under *TRAC*, "[t]he central question in evaluating 'a claim of unreasonable delay' is 'whether the agency's delay is so egregious as to warrant mandamus.'"  *In re Core Commc'ns., Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) ("*Core*"), quoting *TRAC*, 750 F.2d at 79.  In *TRAC*, the D.C. Circuit outlined the principles to consider when deciding whether a delay is unreasonable:

> (1) the time agencies take to make decisions must be governed by a 'rule of reason';
>
> (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;
>
> (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

(4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

(5) the court should also take into account the nature and extent of the interests prejudiced by delay; and

(6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*TRAC*, 750 F.2d at 80 (internal citations and quotation marks omitted).

The D.C. Circuit has reiterated that these considerations "are not 'ironclad,' but rather are intended to provide 'useful guidance in assessing claims of agency delay.'" *Core*, 531 F.3d at 855, quoting *TRAC*, 750 F.2d at 80. There is no one-size-fits-all principle to apply; "[e]ach case must be analyzed according to its own unique circumstances . . . [e]ach case will present its own slightly different set of factors to consider." *Air Line Pilots Ass'n, Int'l v. Civil Aeronautics Bd.*, 750 F.2d 81, 86 (D.C. Cir. 1984).

The first two factors ask whether the delay comports with a rule of reason, which can be more easily discerned if "Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed." *TRAC*, 750 F.2d at 80. The rule of reason has been characterized as the "most important of the *TRAC* factors." *In re People's Mojahedin Org. of Iran*, 680 F.3d 832, 837 (D.C. Cir. 2012) (internal citation and quotation marks omitted). And although 52 U.S.C. § 30109(a)(8)(A) authorizes an aggrieved party to bring a complaint if action has not been taken within 120 days, another court in this district has observed that "Congress did not intend to create a presumption that delay in excess of 120 days was unreasonable, per se." *Citizens for Percy '84 v. FEC*, No. 84–2653, 1984 WL 6601, at *3 (D.D.C. Nov. 19, 1984).

Similarly, in *Common Cause*, the plaintiff brought a claim under a provision of FECA that allowed a party to file a civil claim if they were aggrieved by the FEC's failure to act on a complaint within 90 days of filing. *See Common Cause*, 489 F. Supp. at 742. The plaintiff argued that "any

13

action short of 'final' action within 90 days of the filing of an administrative complaint is contrary to the law within the meaning of the statute." *Id.* The court disagreed and quoted the congressional record, in which a senator noted that another provision in FECA "provides that a total failure to address a complaint within 120 days is a basis for a court action. But (this basis) for judicial intervention (is) not intended to work a transfer of prosecutorial discretion from the Commission to the courts." *Id.* at 743–44, quoting 125 Cong. Rec. S19099 (daily ed. Dec. 18, 1979). Thus, the court concluded, "[w]here the issue before the Court is whether the agency's failure to act is contrary to law, the Court must determine whether the [FEC] has acted 'expeditiously.'" *Id.* at 744.

In *Common Cause*, the FEC had taken two years to investigate a complaint, but the court determined that this did not violate the "rule of reason" because the FEC had entered into multiple conciliation agreements with the plaintiff in the meantime. 489 F. Supp at 744. The D.C. Circuit endorsed this approach in *Rose*. 806 F.2d at 1092 n.17 ("In *Common Cause*, for example, a two-year delay between the filing of a complaint with the FEC *and its conclusion of conciliation agreements* was not found contrary to law.") (emphasis added) (citation omitted).

But here, the problem is not that the FEC failed to take final action on a complaint within the statutorily provided deadline; it has failed to take *any* action beyond the ministerial issuance of a notice of receipt. At the time this suit was filed, the complaint had been pending for more than 575 days, Compl. ¶ 32, and it has now been pending for more than three years. Plaintiff has been prodding the agency to act with the instant case since March of 2020, the FEC has had a quorum since December 18, 2020, Second Notice ¶ 2, and even the time that has elapsed since then has far exceeded the statutory timetable to respond to the administrative complaint. *See Rose*, 806 F.2d at 1091 n.17 (noting the converse; "when we look to the Campaign Act itself to inform

a rule of reason, we see that the Commission acted within all of the time limits specified in that statute.").

Other courts in this district have found that delays of less than two years violated the rule of reason in FECA cases – even when the agency took some action. *See Democratic Senatorial Campaign Comm. v. Fed. Election Comm'n*, No. 95-0349, 1996 WL 34301203, at *9 (D.D.C. Apr. 17, 1996) ("In the 22–month period after DSCC first filed its administrative complaint, the only significant action taken by the FEC was to classify it as a high priority ("Tier One") matter on October 4, 1993.  Although it may be reasonable to take 27 months to complete a complex investigation, it is staggering to suggest it is reasonable to take 22 months to assign an enforcement attorney to a Tier One case or 27 months for the Commissioners to determine whether there is "reason to believe" that violations have occurred and warrant further investigation.").  And though the agency has not represented to this Court what a reasonable timeline might be, it has informed other courts in this district that its goal is to *complete* most enforcement matters within fifteen months.  *See Giffords v. FEC*, No. 19-1192, 2021 WL 4805478, at *7 (D.D.C. Oct. 14, 2021) (finding that, even taking the lack of quorum into consideration, delay was unreasonable for four complaints filed during a similar time period to the instant case:  between August 16, 2018 and December 7, 2018).

Given the language of the statute, the context provided by these other cases, and the fully constituted agency's utter failure to step up and offer any explanation in its own defense after it was given an extended period in which to do so,  the Court finds that the FEC's delay in responding to CLC's administrative complaint does not comport with the rule of reason.  Thus, the first two *TRAC* factors weigh in favor of mandamus relief.

Next, the Court considers what is at stake.  Where a plaintiff's interests are purely commercial, "not directly implicating human health and welfare . . .  the need to protect them through the exceptional remedy of mandamus is therefore lessened." *In re Monroe Commc'ns Corp.*, 840 F.2d 942, 945 (D.C. Cir. 1988) (citation omitted).  Here, "notwithstanding the obvious importance of the political process, this is not a case in which human health and welfare are at stake, and in which agency delay is least tolerable." *Rose*, 806 F.2d at 1092 n.17.  That being said, while "[i]mminent threats to health and [safety] do require immediate agency action, [] threats to the health of our electoral processes also require timely attention." *Democratic Senatorial Campaign Comm.*, 1996 WL 34301203, at *8.  This complaint alleged electoral impropriety in the 2016 Presidential election and it was still sitting unattended in the agency's inbox after the 2020 Presidential election was over.  Therefore, this factor weighs somewhat in favor of granting relief even if it is not as pressing as a matter affecting human health and welfare.

The fourth factor gives deference to an agency's "unique—and authoritative—position to . . . allocate its resources in the optimal way." *In re Barr Laboratories, Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991).  A court may refuse to grant relief "even though all other factors considered in *TRAC* favored it, where 'a judicial order putting [the petitioner] at the head of the queue [would] simply move[] all others back one space and produce[] no net gain.'" *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003), quoting *Barr*, 930 F.2d at 75.

In *Mashpee* and other comparable cases, the agency in question had informed the court that the relevant appeals were processed by the agency in a queue on a first-come, first-served basis; "[n]o statute or regulation specifie[d] how quickly the queue must move along."  336 F.3d at 1097 (internal citations omitted).  But here, the FEC has not indicated that the administrative complaint has been delayed because it is behind others in a queue or that addressing it would "simply move

all others back one space and produce no net gain." *Id.* at 1100 (internal quotations and omissions omitted). Nor is this analogous to *Rose*, where "a judicial order in 1984, when the District Court ruled on the merits, may well have adversely affected the FEC's ability to attend to 'activities of a higher competing priority,' not the least of which was the Presidential election of that year." 806 F.2d at 1092 n.17. Rather, this case involves a presidential election, a pressing priority for an agency tasked with monitoring electoral laws. So this factor, which generally weighs in favor of the agency, is instead neutral at best – the Court simply does not have information to justify deference to unspecified agency priorities, while plaintiff's complaint provides sufficient allegations indicating that the complaint should itself be a priority.

The fifth *TRAC* factor looks to the nature and extent of the interests prejudiced by delay. *See* 750 F.2d at 80. Plaintiff alleges that those interests include "undermin[ing] public confidence in our elections by allowing apparent violations of the law to go uninvestigated and unreddressed." Pl.'s Mot. at 12. While it is premature for the Court to weigh in on whether the law was in fact violated, there is no question that public confidence in our electoral system can also be undermined when alleged violations of law remain unaddressed. Voting is "the most basic of political rights," *Akins*, 542 U.S. at 25, and "[p]ublic confidence in our democratic electoral system, which [FECA] seeks to protect, turns on investigations that are conducted within a reasonable time and on effective enforcement." *Giffords*, 2021 WL 4805478, at *7, quoting *Democratic Senatorial Campaign Comm.*, 1996 WL 34301203, at *8. Here, in addition to the importance of the electoral process, the length and timing of the delay bear on the nature of the interests prejudiced, as problems alleged in connection with one Presidential election were not looked into before the next. "Election cycles, while not dispositive, are not irrelevant." *Democratic Senatorial Campaign Comm.*, 1996 WL 34301203, at *7. Thus the fifth factor weighs in favor of mandamus relief.

17

Finally, the sixth *TRAC* factor cautions that courts need not find impropriety to hold that the agency action is unreasonably delayed. 750 F.2d at 80. No impropriety is alleged, so this factor is neutral.

Therefore, the Court finds that consideration of all of the *TRAC* factors weighs in favor of granting mandamus relief.

**CONCLUSION**

As this Court noted previously, "[t]he languishing of plaintiff's complaint and the failure of the agency to appear in this action are disturbing signs that the agency has been dysfunctional and broken for some time." Order at 3 (footnote omitted). But at this point, dysfunction is no excuse; the failure to act is simply contrary to law. For the foregoing reasons, the Court will **GRANT** plaintiff's motion for default judgment, find that the agency's failure to act is contrary to law, and will order the FEC to act on the complaint within thirty days pursuant to 52 U.S.C. § 30109(a)(8)(C). The Court also awards plaintiff the $400 in court costs requested pursuant to 28 U.S.C. § 1920. And the Court will retain jurisdiction, as requested, Pl.'s Mot. at 18 n.7, until the agency acts.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: November 8, 2021